IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AFFINITY FIRST FEDERAL CREDIT
UNION ET AL.,

    *Plaintiff,*

vs.

    Case No. 23-2155-EFM-TJJ

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,

    *Defendant.*

**MEMORANDUM AND ORDER**

Before this Court is a Motion to Dismiss (Doc. 11) from Defendant National Credit Union Administration Board ("NCUA") in its capacity as liquidating agent for U.S. Central Federal Credit Union ("Central"). Plaintiffs are twenty-five individual credit unions and former capital holders of Midwest Corporate Federal Credit Union ("Midwest"). Defendant seeks dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that Plaintiffs fail to state a facially plausible claim upon which relief can be granted.

    **I.**    **Factual and Procedural Background[1]**

Before the financial collapse of 2008–2009, Central was the largest corporate credit union in the United States. Central had both Membership Capital Accounts ("MCAs") and Paid-in

---

[1] Because Defendant moves to dismiss under Rule 12(b)(1) and (b)(6), the facts in this section are taken from Plaintiff's Complaint unless otherwise cited.

Capital Accounts ("PICs") which were funded by various regional corporate credit unions, including Midwest.

Due to investment losses incurred by Central, the NCUA started to liquidate Central and appointed itself as Central's liquidating agent on October 1, 2010. Midwest, a North Dakota-based credit union, was an MCA and PIC holder of Central at the time. On October 5, 2010, on behalf of Central, the NCUA issued a Claim Receipt to Midwest for member contributed capital. The Claim Receipt provided in relevant part:

> Under normal circumstances, a member of [Central] is required to file a claim against the liquidation estate to recover its depleted capital on the basis of, for example, an "error in accounting estimation." In recognition of credit unions' concerns about the depletion of their capital, however, the NCUA Board has chosen to issue this "Claim Receipt for Member Contributed Capital" representing the value of your PIC and MCA balances as of November 30, 2008.

The Claim Receipt indicated that Midwest had a PIC balance of $3,300,000 and an MCA balance of $10,448,323.99. Additionally, it stated:

> Upon final resolution of the [Central] liquidation estate, this Claim Receipt will enable you to share pro rata in the net proceeds, if any, to the extent of your PIC and MCA balances as of the record date. No further action is required on your part to file or activate a liquidation claim.

Midwest was given no indication that the Claim Receipt would expire or terminate, and the Claim Receipt has never been withdrawn or revoked.

On March 14, 2011, Midwest's Board of directors voted to voluntarily liquidate Midwest, a decision affirmed by Midwest's capital holders eleven days later. Upon reaching this decision, Midwest's liquidating agent sent the NCUA a Certificate of Dissolution and Liquidation, certifying to the NCUA that the liquidation was complete. The NCUA, being aware of Midwest's outstanding Claim Receipt, cancelled Midwest's charter effective October 27, 2011.

After nearly a decade, in April 2021, the NCUA authorized Central to reimburse Midwest for all the money in its MCA ($10,448,323.99) and for 3% of the money in its PIC ($99,000.00). On May 27, 2021, the NCUA sent Plaintiffs letters advising that it would not distribute the funds due under the Claim Receipt because Midwest ceased its legal existence in October 2014. According to the NCUA, Midwest, as a dissolved credit union, was ineligible to receive a distribution. After various exchanges between the parties, the NCUA informed Plaintiffs that they could submit a claim. On September 2, 2022, each of the twenty-five individual Plaintiffs submitted claims requesting payment of Midwest's distribution in accordance with each Plaintiff's pro rata share.

On February 9, 2023, the NCUA sent a letter to each Plaintiff disallowing each's individual claims. Because Plaintiffs disagreed with the Central's liquidating agent's determination regarding their claims, Plaintiffs sought judicial determination in accordance with 12 C.F.R § 709.7. Plaintiffs filed their Complaint with this Court on April 10, 2023. Defendant filed a Motion to Dismiss based on Federal Rule of Civil Procedure (12)(b)(1) and (12)(b)(6) on June 13, 2023.

## II. Legal Standard

A motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) may take one of two forms: a facial attack or a factual attack.[2] Here, the NCUA asserts a facial challenge, which looks only to the factual allegations of the complaint in challenging the court's jurisdiction.[3] As such, the Court applies the same standards under Rule

---

[2] *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).

[3] *See id.*

12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action.[4]

Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[5] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[6] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[7] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[8] Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[9] Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[10] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[11]

---

[4] *Muscogee Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).

[5] Fed. R. Civ. P. 12(b)(6).

[6] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[7] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[8] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[9] *Iqbal*, 556 U.S. at 678–79.

[10] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[11] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

## III. Analysis

This case concerns a property dispute. Specifically, the parties contest what happens when property originally owned by a federal credit union remains undistributed after the credit union's dissolution. Plaintiffs argue that the omitted assets automatically transfer to the credit union's shareholders. Defendant argues that failure to formally transfer the property within the dissolution timeframe terminates all claims to it.

Defendant's Motion to Dismiss is based on two challenges. First, Defendant asserts that Plaintiffs bring suit outside the applicable survival statute timeframe. Second, Defendant argues that Plaintiffs have no ownership rights to the Claim Receipt. The Court will address each argument in turn.

### A. Plaintiffs sue in their individual capacities, rendering the survival statute's expiration inapplicable.

Defendant first argues that Plaintiffs suit is barred by the applicable three-year survival statute.[12] This argument, however, relies on a misreading of the facts as alleged by Plaintiffs. Here, Plaintiffs do not assert a claim on behalf of Midwest, a defunct federal credit union. Rather, they bring this suit in their individual capacities as former Midwest shareholders.

A shareholder's claim is derivative if brought to enforce a corporate cause of action.[13] This means that the alleged violated right belongs to the corporation, and the corporation will suffer harm without enforcement.[14] In those cases, the alleged injury only affects the shareholders

---

[12] *See* 12 U.S.C. § 1766 (b)(5) ("[T]he corporate existence of the Federal credit union shall continue for a period of three years from the date of such cancellation of its charter, during which period the liquidating agent, or his duly appointed successor, or such persons as the Board shall designate, may act on behalf of the Federal credit union for the purpose of . . . adjust[ing] and wind[ing] up its business and affairs, and it may sue and be sued in its corporate name.").

[13] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991).

[14] *See Barnes v. Harris*, 783 F.3d 1185, 1193 (10th Cir. 2015).

indirectly as a byproduct of their relationship with the corporation.[15] Derivative suits brought after the timeframe specified in the applicable survival statute are barred.[16] In contrast, a claim is direct when shareholders sue on their own behalf to enforce a right to which they are individually entitled—regardless of whether the corporation's rights are also implicated.[17] In direct actions, the timeframe imposed by survival statutes no longer applies.[18]

Here, Plaintiffs bring a direct action. As Defendant observes, Midwest has not existed for over a decade. Thus, Plaintiffs cannot bring suit on behalf of a non-existing entity. Rather, Plaintiffs bring suit to recover an asset which they claim to individually hold—not an asset that Midwest holds. Plaintiffs allege that they obtained personal ownership rights to the Claim Receipt automatically upon Midwest's dissolution. Whether that claim has a legal basis will be addressed next. But as to whether Plaintiffs have sufficiently pled a direction action, the Court finds that they have. As such, their claims are not barred by the survival statute. Accordingly, the Court will next address whether Plaintiffs have ownership rights to the Claim Receipt.

**B.      The Claim Receipt is a fixed and ascertainable asset that automatically transferred to Plaintiffs upon Midwest's dissolution.**

Next, Defendant raises both a legal issue and a factual issue. First, Defendant legally argues that Plaintiff's failure to assign and distribute the Claim Receipt before the conclusion of Midwest's wind-up period terminated Central's responsibility to make good on the Claim Receipt.

---

[15] *See id.*

[16] *See Carmichael v. Halstead Nursing Ctr., Ltd.*, 237 Kan. 495, 499–500, 701 P.2d 934, 937 (1985); *see also Hutson v. Fulgham Indus., Inc.*, 869 F.2d 1457, 1461 (11th Cir. 1989); *Hunter v. Old Ben Coal Co.*, 844 F.2d 428, 432–33 (7th Cir. 1988); *Empire Life Ins. v. Valdak Corp.*, 468 F.2d 330, 335–36 (5th Cir. 1972); *Jenot v. White Mountain Acceptance Corp.*, 474 A.2d 1382, 1386 (N.H. 1984); *Shute v. Chambers*, 492 N.E.2d 528, 532 (Ill. App. 1986).

[17] *Franchise Tax Bd. v. Alcan Aluminum*, 493 U.S. 331, 336 (1990).

[18] *See Carmichael*, at 499–500, 701 P.2d at 937; *see also Hutson*, 869 F.2d at 1461; *Hunter*, 844 F.2d at 432–33; *Empire Life Ins*, 468 F.2d at 335–36; *Jenot*, 474 A.2d at 1386; *Shute*, 492 N.E.2d at 532.

Second, Defendant argues that even if most assets automatically transfer upon dissolution, "unfixed and unascertainable" assets do not. Thus, Defendant factually argues that the Claim Receipt, being such an asset, did not survive dissolution. The Court will address Defendant's legal argument first.

> 1. *The Claim Receipt automatically transferred to Plaintiffs upon Midwest's dissolution.*

Both parties agree that the Federal Credit Union Act of 1934 ("FCUA")[19] and its accompanying federal regulations[20] are the controlling law in this case. The FCUA provides that funds remaining "after all accountholders, creditors, other claimants, and administrative expenses are paid" shall be distributed "to the credit union's shareholders or members."[21] Additionally, it requires that the liquidating agent shall "make distribution[s] and payment[s] to creditors and members as their interest may appear."[22] The liquidating agent may also accept "the statement of any amount due to such creditor or member" instead of "a formal proof of claim."[23] In cases where corporate credit unions are liquidated, the liquidating agent shall follow the order of priority when making distributions.[24] All higher priority claims must be paid in full before any claims of lesser priority are paid.[25] If a surplus remains after making all other distributions in full, "such surplus

---

[19] 12 U.S.C. §§ 1751–1795k.

[20] *See* 12 C.F.R. §§ 700–797.25.

[21] 12 U.S.C. § 1787(b)(11)(B).

[22] 12 U.S.C. § 1766(b)(3)(C).

[23] 12 U.S.C. § 1766(b)(4)(B).

[24] 12 C.F.R. § 709.5(b); *see also* 12 C.F.R. § 702.412(c) (discussing the effect of voluntary dissolution on the treatment of subordinated debt as regulatory capital).

[25] 12 C.F.R. § 709.5(e).

shall be distributed pro rata to the credit union's shareholders."[26] But nowhere does the FCUA explicitly address what happens to the credit union's undistributed property upon dissolution.

Plaintiffs suggest that on the date of expiration, the remaining assets should pass to the shareholders automatically by operation of law. Defendants, however, contend that the credit union must formally transfer the remaining assets to the shareholders—by way of assignment or a bill of sale—within the wind-up period; if the credit union fails to do so, the undistributed assets cease to exist.

Ultimately, this is a matter of statutory construction. When construing a statute, the first question a court must always ask is whether Congress has directly spoken to the precise question at issue.[27] If Congress's intent is clear, "that is the end of the matter" because courts "must give effect to the unambiguously expressed intent of Congress."[28] Although the FCUA gives detailed instructions on how to commence and conduct liquidation proceedings, there is no clear guidance on what to do *after* the wind-up period terminates. More specifically, there is no guidance on what to do with assets omitted not only from the liquidation plan, but from liquidation altogether. Thus, in this case, the Court concludes that Congress has not directly spoken to the precise question at issue.

When Congress is silent, the administering agency may construe the statute, and the court will usually defer to the agency's interpretation.[29] In this case, Congress has explicitly given the

---

[26] *Id.*

[27] *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984).

[28] *Id.*

[29] *Id.* at 843–44.

NCUA Board the power to prescribe rules and regulations for the administration of the FCUA.[30] Here, however, neither party has presented a NCUA rule and regulation interpreting the FCUA in favor of either side. Thus, when "the statute is silent . . . with respect to the specific issue," and "in the absence of administrative interpretation," the court may "impose its own construction on the statute."[31]

The Supreme Court has indicated that lower courts should fill federal statutes' gaps with uniform federal rules when "express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand."[32] If no guidance may be gleaned from similar federal statutory schemes, federal courts should "adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation."[33]

This Court has analyzed many similar bodies of law, including savings associations,[34] national banks,[35] and farm credit administration.[36] However, none of the statutory schemes related to these subjects shed light on how omitted assets should be handled after wind-up concludes. Thus, the Court must turn its attention to the arena of state law to find legal principles readily applicable to the present case.

As an initial matter, the parties offer no clear argument as to which state law this Court should apply. Nevertheless, the Court will start by examining North Dakota law because Midwest

---

[30] 12 U.S.C. § 1766(a).

[31] *Chevron*, 467 U.S. at 843.

[32] *Kamen*, 500 U.S. at 98.

[33] *United States v. Kimbell Foods*, 440 U.S. 715, 740 (1979).

[34] 12 U.S.C. §§ 1461–1470.

[35] 12 U.S.C. §§ 21–216d.

[36] 12 C.F.R §§ 600–655.1.

was a North Dakota-based credit union. All North Dakota law requires is that the commissioner take possession of the credit union's undistributed assets and "complete the liquation process" without so much as listing an order of priority.[37] This fails to address the underlying question of whether asset transfer occurs automatically or only upon formal transfer. Thus, the Court looks beyond state credit union law to the largely identical state corporate law.

Although North Dakota has never interpreted its *credit union* omitted assets statute, it has construed its *corporate* omitted assets statute. In *Brend v. Dome Development*,[38] the North Dakota Supreme Court analyzed its corporate omitted assets statute which states, "Title to assets remaining after payment of all debts, obligations, or liabilities and after distributions to shareholders may be transferred by a court in this state."[39] The court held that the statute's language permitted a court to transfer title to "any assets omitted from distribution to the shareholders."[40] From this, this Court can reasonably infer that North Dakota's law renders the shareholders the rightful owners of omitted assets, even if a court must ultimately broker the transfer.

Essentially, that is what Plaintiffs ask us to do in this case. Unlike in *Brend*, Plaintiffs do not claim that Midwest transferred its Claim Receipt to them at some point after the winding-up period terminated. Rather, Plaintiffs admit that the Claim Receipt was never formally assigned or conveyed to them. Thus, all Plaintiffs ask this Court is to determine that they are entitled to the Claim Receipt—i.e., Midwest's omitted asset.

---

[37] N.D. Cent. Code § 6-06-33.

[38] 418 N.W.2d 610 (N.D. 1988).

[39] N.D. Cent. Code § 10-19.1-126.

[40] *Brend*, 418 N.W.2d at 612–13.

A review of other states' law supports Plaintiffs' position. Each state with an asset omission statute follows the rule that upon corporate dissolution, and after all creditors have been paid, all remaining interests in the dissolved corporation's property passes to the corporation's shareholders by operation of law—and usually without the need for a court ordered transfer.[41] Thus, the Court considers this uniformity among states persuasive in interpreting the otherwise silent provisions of FCUA.

And yet, it is not enough for this Court to find state law persuasive. It must also consider whether incorporating state law to determine shareholders' rights to omitted assets is consistent with the FCUA's administration.[42] The FCUA specifically says that state credit union laws "provide for the organization of credit unions similar in principle and objectives to Federal credit unions."[43] Additionally, when the NCUA issued a rule and regulation regarding the Federal Credit Union Bylaws, it reiterated its "long standing view" that "generally state corporate law to the extent it is consistent with the FCUA and NCUA regulations, determines disputes . . . ."[44] Thus,

---

[41] Alaska Stat. § 10.06.679(c) ("Assets inadvertently or otherwise omitted from the winding up continue as assets of the dissolved corporation for the benefit of persons entitled to the assets upon dissolution of the corporation and on realization the assets shall be distributed to the persons entitled."); Cal. Corp. Code § 2010(c) (same as Alaska Stat. § 10.06.679(c)); Minn. Stat. § 303A.791 ("Title to assets remaining after payment of all debts, obligations, or liabilities and after distributions to shareholders may be transferred by a court in this state."); Miss. Code Ann. § 79-1-17 ("On the dissolution of any corporation, either by judgment or otherwise, all its real and personal estate shall be vested in the stockholders . . . ."); N.M. Stat. Ann. § 53-16-24 (1978) ("The dissolution of a corporation does not take away or impair any remedy available to or against the . . . shareholders, for any right or claim existing, or any liability incurred, prior to the dissolution . . . . The shareholders . . . may take such corporate or other action as appropriate to protect the remedy, right or claim."); *De Martini v. McCaldin*, 184 A.D. 222, 226 (N.Y. App. Div. 1918); Okla. Stat. Ann. tit. 18, § 1100.2 (2019) ("Any remaining assets shall be distributed to the shareholders of the dissolved corporation."); *Theta Props. v. Ronci Realty Co.*, 814 A.2d 907, 917 (R.I. 2003) (holding that stockholders retain a reversionary interest in the dissolved corporation's property, especially when there are no creditors); Tenn. Stat. § 48-245-1102 (same as Minn. Stat. § 303A.791).

[42] *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (holding that courts' construction of a statutory phrase "must, to the extent possible, ensure that the statutory scheme is coherent and consistent").

[43] 12 U.S.C. § 1752(6).

[44] 71 Fed. Reg. 24551, 24558.

even though asset omission does not appear in the federal statute, this Court can reasonably infer that state statutes providing explicitly for asset omission accomplish similar principles and objectives to the FCUA. Therefore, applying the majority of states' asset omission laws—i.e., automatic transfer upon dissolution—is consistent with the FCUA's administration.

Furthermore, simple logic and hornbook property law support construing the FCUA as including automatic transfer of assets.[45] In general, assets do not simply evaporate when the owner is unable to collect; rather, the property must go somewhere.[46] Consequently, a credit union's assets likewise do not cease to exist come the last day of wind-up. Instead, the most logical conclusion is that the assets vest in the credit union's shareholders. Accordingly, the Court concludes that, as a matter of law, the Claim Receipt vested in Plaintiffs upon Midwest's dissolution. As such, the Claim Receipt's transfer was not contingent upon Central's dissolution.

Lastly, the Court must address Defendant's alternative factual argument. That is, even if automatic transfer generally applies, it does not apply to unfixed and unascertainable assets such as the Claim Receipt.

---

[45] *See* 16A Fletcher Cyc. Corp. § 8144.40 ("Corporation continuance statutes do not supplant the equitable rule that shareholders succeed to the assets of a dissolved corporation and therefore they are entitled to maintain an action on that basis despite expiration of the corporation's wind-up period."); 16A Fletcher Cyc. Corp. § 8224 ("After dissolution, the property of the corporation passes to the shareholders, subject to the payment of corporate debts."); 19 Am. Jur. 2d Corporations § 2468 ("The shareholders of a corporation, when its existence ceases, become vested with legal title to its property as tenants in common . . . ."); 19 C.J.S. Corporations § 950 ("In the context of corporate law, the general rule is that when a corporation is dissolved and its affairs wound up, such assets as remain, after the satisfaction and discharge of all liabilities and obligations, belong to the shareholders.").

[46] *Commissioner v. Munter*, 331 U.S. 210, 215 (1947) ("[I]f the predecessors' earnings and profits are not distributed in the course of the reorganization, they do not disappear simply because the successor corporation has some assets and owners in addition to those of the old corporation or corporations."); *Barnhart v. Hickman*, 435 F.2d 913, 916 (10th Cir. 1970) ("It is fundamental that when one dies, intestate, leaving real property, the title thereto immediately vests in his heirs, subject only to his creditors and administration proceedings, and that they may immediately convey their interest.").

### 2. *The Claim Receipt is a fixed and ascertainable asset.*

Defendant argues that Plaintiffs' ability to collect on the Claim Receipt was contingent upon net proceeds remaining after Central's dissolution. Defendant contends that, consequently, Plaintiffs cannot collect on the Claim Receipt because Central's net proceeds were unknown at the time of Midwest's dissolution, and the amount ultimately remaining was "not within Midwest's control."

The FCUA draws no distinction between fixed and unfixed or ascertainable and unascertainable assets. But Defendant's argument ignores basic contract principles, nonetheless. It is well established that "a promise or order is not made conditional . . . because payment is limited to resort to a particular fund or source."[47] In other words, just because the amount due to Plaintiffs could fluctuate depending on the remaining net proceeds does not revoke Plaintiffs' entitlement to the funds altogether.

As alleged, Central promised to pay Midwest a fixed sum of money—the remaining balances in its MCA and PIC accounts. And, Central promised to honor the Claim Receipt and pay the specified amounts therein at a specified time which would certainly arrive—"upon final resolution of the USC liquidation estate." Just because it was uncertain whether there would be extra money after satisfying all of Central's liabilities does not mean that the Claim Receipt was "unfixed" or "unascertainable." Rather, upon resolution of the estate, Central would discover how much money it had left to make good on the Claim Receipt. Thus, as a factual matter, the Claim

---

[47] N.D. Cent. Code § 41-03-06(2); Kan. Stat. § 84-3-106(b); *see also* Ala. Code § 7-3-106; Alaska Stat. § 45.03.106; Ariz. Rev. Stat. Ann. § 47-3106; Cal. Com. Code § 3106; Colo. Rev. Stat. § 4-3-106; Conn. Gen. Stat. § 42a-3-106; D.C. Code § 28:3-106; Fla. Stat. § 673.1061; Ga. Code. Ann. § 11-3-106; Haw. Rev. Stat. § 490:3-106.; Idaho Code § 28-3-106; 810 Ill. Comp. Stat. 5/3-106; Ind. Code Ann. § 26-1-3.1-106; Iowa Code § 554.3106; La. Stat. Ann. § 10:3-106; Mass. Gen. Laws ch. 106, § 3-106; Mo. Rev. Stat. § 400.3-106; N.C. Gen. Stat. § 25-3-106; N.H. Rev. Stat. Ann § 382-A:3-106; Neb. Rev. Stat. § 3-106; 13 Pa. Stat. and Cons. Ann. § 3106; Va. Code Ann. § 8.3A-106; W. Va. Code § 46-3-106; Wash. Rev. Code § 62A.3-106.

Receipt is a fixed and ascertainable asset. As such, Plaintiffs have properly asserted a claim against Defendant to make good on that Claim Receipt. Accordingly, the Court denies Defendant's Motion.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss (Doc 11) is **DENIED.**

**IT IS SO ORDERED.**

Dated this 5th day of October, 2023.

*[signature: Eric F. Melgren]*

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE